**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATUL SHARMA, | |
| Plaintiff, | Case No. 26-CV-3220 |
| -against- | |
| BRAINLABS USA, LLC, | **COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Atul Sharma ("Plaintiff" or "Mr. Sharma"), by and through his attorneys, Mesidor PLLC, against

Brainlabs ("Defendant" or "Brainlabs" or "the Company"), alleges upon knowledge as to himself

and his own actions and upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT

1.      Brainlabs USA, LLC, a digital marketing and data analytics agency that proclaims

itself as, "fastest-growing independent media agencies" publicly promotes a work culture focused

on teamwork and supporting the growth of its employees. In practice, this collaborative, supportive

environment only applies to those who fit the mold of Brainlabs' "ideal" employee—white, native

English speakers.

2.      Mr. Sharma is a highly accomplished data analytics professional with nearly 25

years of experience in his field. Brainlabs hired him on April 23, 2024, as Vice President of Data,

and promoted him to Head of Data, North America in October 2024.

3.      Mr. Sharma demonstrated early success in his role. He led a global team of 18 data

professionals, managed high-profile client relationships, and generated $300,000 in new cross-sell

data revenue between October 2024 and June 2025—exceeding the Company's goals for him. His

initial supervisor, Jeremy Hull, praised Mr. Sharma as a "fantastic addition to Brainlabs" and

someone who "wasted no time establishing himself." Mr. Sharma had never received a negative performance review or been placed on a performance improvement plan in his entire 25-year career.

4. Everything changed in March 2025, when Andrew Littlewood became Mr. Sharma's supervisor. Mr. Littlewood immediately targeted Mr. Sharma with discriminatory harassment based on his race and national origin, repeatedly telling him, "Your English is funny" and "You have an accent." Mr. Littlewood also subjected Mr. Sharma to micromanagement, scrutiny, and hostility that he did not apply to his white direct reports.

5. When Mr. Sharma complained about this discrimination to Human Resources ("HR") on April 1, 2025, Brainlabs quickly retaliated with a negative performance review just one month later, placing him on a pretextual performance improvement plan two months later, and ultimately, terminating his employment about four months after his complaint of discrimination.

6. Mr. Sharma brings this action for violations of 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. L. §§ 290 *et seq* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL"). He will amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"), upon receipt of his Notice of Right to Sue from the Equal Employment Opportunity Commission.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

8.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims under Section 1981 are brought to recover damages for deprivation of equal rights.

9.      This Court has supplemental jurisdiction over Plaintiff's state and local law claims under the NYSHRL and NYCHRL pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims as to form part of the same case or controversy.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## ADMINISTRATIVE PREREQUISITES

11.     On January 15, 2026, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Charge Number 520-2026-02658) alleging race, color, national origin, and retaliation discrimination. Plaintiff cross-filed this charge with the New York State Division of Human Rights and the New York City Commission on Human Rights.

12.     Plaintiff has not yet received a Notice of Right to Sue from the EEOC. Upon receipt, Plaintiff will move to amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964.

13.     Section 1981, the New York State Human Rights Law, and the New York City Human Rights Law do not require exhaustion of administrative remedies. This Complaint is timely filed.

**PARTIES**

*Plaintiff*

14.    Plaintiff Atul Sharma is an Indian-American man who resides in New York, New York.

15.    Mr. Sharma joined Brainlabs on April 23, 2024. and worked primarily within the Southern District of New York, until his termination on September 5, 2025.

16.    At all relevant times, Mr. Sharma was an "employee" within the meaning of Section 1981, the NYSHRL, and the NYCHRL.

*Defendant*

17.    Defendant Brainlabs USA, LLC is a digital marketing and data analytics agency with its principal place of business at 501 N Morton St, Ste 212, Bloomington, IN, 47404.

18.    Defendant maintains offices within the Southern District of New York at 140 East 45th Street, 32nd Floor, New York, NY, 10017.

19.    Defendant employs more than 500 employees.

20.    At all relevant times, Defendant was an "employer" within the meaning of Section 1981, the NYSHRL, and the NYCHRL

**FACTUAL ALLEGATIONS**

**I.    Plaintiff's Initial Success at Brainlabs**

21.    Brainlabs hired Plaintiff on April 23, 2024, as Vice President of Data.

22.    The Company recognized his extensive qualifications and expertise, and soon after his hire, promoted him to Head of Data, North America. In this senior leadership role, Mr. Sharma was entrusted with significant responsibilities that were critical to the Company's success.

4

23.    As Head of Data, North America, Mr. Sharma led and mentored a global team of 18 data professionals, including two Directors and a dedicated offshore team in India. His responsibilities encompassed ensuring high-impact delivery across analytics, forecasting, and measurement solutions for Brainlabs' most important clients.

24.    Mr. Sharma managed key client relationships across multiple high-profile accounts, most notably Capital One, Bealls, and Duke's Mayo. He proactively addressed client challenges, guided strategic roadmaps, and delivered actionable insights that drove client satisfaction and retention. Mr. Sharma specialized in simplifying complex measurement solutions into clear, digestible recommendations for stakeholders at all levels.

25.    Mr. Sharma's role also included partnering with third-party platforms such as Google, Meta, and Amazon to develop collaborative measurement workstreams. He set multi-year visions for major accounts like Capital One, aligning strategies with industry shifts such as cookie deprecation and server-to-server connections. Mr. Sharma confidently led conversations around optimal measurement strategies and took full ownership of forecasting deliverables, continuously striving to elevate the quality, clarity, and business value of Brainlabs' data work.

26.    Mr. Sharma's performance at Brainlabs was exceptional from the start. He delivered significant and measurable revenue contributions to the Company, generating $300,000 in new cross-sell data revenue between October 2024 and June 2025. This achievement exceeded the goals that Brainlabs had set for him and demonstrated his ability to identify opportunities, build relationships, and drive business growth.

27.    Mr. Sharma's initial supervisor, Jeremy Hull, recognized his outstanding contributions and leadership. In Mr. Sharma's October 2024 performance review—the only review

he received before Andrew Littlewood's arrival, Mr. Hull provided overwhelmingly positive feedback, including the following specific comments:

   a. "Atul is a fantastic natural storyteller. With a little development on presentation training and slide construction, he'll be unstoppable."

   b. "Atul jumped into a complex agency, client, and team and wasted no time establishing himself. His expertise plus his enthusiasm makes him a fantastic addition to Brainlabs."

   c. "He's won over the client incredibly well—that was the key assignment I gave him as he joined, and he did exactly what he needed to there!"

   d. "He's done a very good job getting to know the team, managing them effectively, and advocating for them. He brings clear recommendations, asks for help at the right time and in the right way, and is wonderfully collaborative."

   e. "I've also been incredibly impressed by his thought leadership— across written pieces, presentations, and LinkedIn activity."

28. This record of success and praise established that Mr. Sharma was a top-tier performer who was excelling in his role and adding immense value to Brainlabs. He was recognized as a fantastic addition to the team, a skilled client relationship manager, an effective people leader, and a strategic thinker.

29. Prior to Andrew Littlewood's arrival in March 2025, Mr. Sharma had never received any performance concerns, criticisms, or negative feedback regarding his work at Brainlabs. He had no disciplinary history and had never been the subject of complaints about his

performance, conduct, or professionalism. During his entire career, he had never been placed on a performance improvement plan.

## II.    Discriminatory Treatment Under Andrew Littlewood

30.    The supportive and collegial environment Mr. Sharma had initially enjoyed at Brainlabs deteriorated rapidly and dramatically in March 2025, when Littlewood assumed the role of Chief Data, Planning, and Strategy Officer, and Mr. Sharma began reporting directly to him.

31.    Almost immediately upon becoming Mr. Sharma's supervisor, Littlewood began subjecting him to discriminatory treatment based on his race, color, and national origin.

32.    Littlewood's discriminatory harassment included demeaning and offensive comments about Mr. Sharma's accent and his use of English, including "Your English is funny" and "You have an accent."

33.    Littlewood's discriminatory behavior extended far beyond offensive verbal comments and permeated his entire management approach toward Mr. Sharma. Littlewood weaponized standard professional tools against Mr. Sharma, scrutinizing them as supposed performance deficiencies.

34.    For example, in June and July 2025, Littlewood criticized Mr. Sharma's use of Grammarly, a widely used professional writing assistance tool used by native and non-native English speakers alike. Mr. Sharma had always been transparent about using Grammarly to ensure clarity and professionalism in his written communications, especially given his non-native English-speaking background. Rather than recognizing this as a reasonable practice. Littlewood questioned Mr. Sharma's use of the tool and framed it as a performance concern.

35.     Similarly, Littlewood criticized Mr. Sharma's use of ChatGPT to validate Python code for a major forecast project. However, this was a responsible quality assurance step and a standard practice in data analytics work.

36.     Littlewood also subjected Mr. Sharma to excessive micromanagement and placed him under a microscope in a manner that was not applied to his other direct reports. In doing so, Littlewood held Mr. Sharma to different and more stringent standards than his colleagues and scrutinized his work with an unwarranted level of intensity.

37.     Littlewood publicly undermined Mr. Sharma in front of colleagues, creating a hostile and humiliating work environment that ostracized Mr. Sharma from his team.

38.     Littlewood's other direct reports, including Kathleen Cook, a white employee who joined in June 2025, were not subjected to the same scrutiny or performance expectations. Plaintiff was the only direct report Littlewood placed under a microscope.

39.     Despite Cook's comparable role to Plaintiff, Littlewood did not subject Cook to the same level of scrutiny, micromanagement, or performance expectations that he imposed on Mr. Sharma. Littlewood never required Cook to follow the same performance goals or standards he set specifically for Mr. Sharma.

40.     In June 2025, Kathleen Cook, another white employee, began reporting directly to Littlewood. Once again, Littlewood did not set similar expectations, performance goals, or apply the same level of scrutiny to Cook as he applied to Mr. Sharma. This pattern of selective enforcement was consistent and glaring.

41.     Mr. Sharma, the only person of color reporting directly to Littlewood, was the only member of Littlewood's team who was subjected to this intense level of micromanagement, criticism, and disparate treatment.

8

42.     This discriminatory treatment represented a radical and jarring departure from the positive performance reviews, supportive feedback, and collegial treatment Mr. Sharma had received under his previous supervisor, Jeremy Hull. Prior to Littlewood's arrival, Mr. Sharma had never received any performance concerns or criticisms. The sudden shift in his treatment coincided precisely with Littlewood becoming his supervisor, and the nature of the criticism—focused on his accent, his English, and the tools he used to accommodate his non-native English background—made clear that the change was driven by discriminatory animus based on his race, color, and national origin.

### III.     Protected Activity: Complaints to HR and Retaliation

43.     On April 1, 2025, Plaintiff complained to Human Resources ("HR") Partner Tolley St. Clair about Littlewood's verbal harassment, bullying, and racist comments. HR's only response was sending Plaintiff an Employee Assistance Program flyer via Slack. No investigation was initiated. No interviews were conducted with Littlewood or any witnesses. No corrective action was taken. No follow-up was provided to Mr. Sharma regarding his complaint. The Company's response to a formal complaint of racial discrimination amounted to nothing more than a generic resource document sent through an internal messaging system.

44.     The stress and anxiety caused by Littlewood's continued discriminatory treatment, combined with HR's complete failure to respond meaningfully to his complaint, began taking a severe toll on Mr. Sharma's mental and physical health. Following his April 1 complaint to HR, Mr. Sharma began attending therapy on a daily basis in an attempt to cope with the hostile work environment he was enduring.

45.     Just one month later, on May 2, 2025, Littlewood gave Plaintiff a "Developing" performance rating—the second-lowest rating in the Company's performance evaluation system.

This was the first negative performance review Plaintiff had ever received in his nearly 25-year career.

46. The "Developing" rating was particularly suspect because Littlewood was evaluating work that Mr. Sharma had performed before Littlewood even joined Brainlabs as his supervisor in March 2025. Despite Mr. Sharma's documented success in generating $300,000 in new cross-sell revenue, managing high-profile client relationships, and receiving specific praise from  Hull for his performance during the exact period being reviewed, Littlewood suddenly characterized the same work as deficient. The timing—precisely one month after Mr. Sharma complained about discrimination—and the radical inconsistency with prior evaluations made clear that this negative rating was retaliatory rather than based on any legitimate performance concerns.

47. In May 2025, Plaintiff escalated his concerns to Virginia Hancher, Head of HR for North America. Mr. Sharma hoped that by bringing his complaints to a more senior HR leader, Brainlabs would finally take his reports of discrimination seriously and conduct a proper investigation.

48. Rather than taking corrective action or initiating an investigation, Hancher delivered a chilling warning to Mr. Sharma. She advised him to "be careful" in pursuing his complaints because Littlewood was close personal friends with senior leadership at Brainlabs, specifically naming North America CEO Adam Potashnick and Chairman Steve Allen. This warning strongly suggested that reporting Littlewood's discriminatory conduct would not be effective and would likely be futile given his protected status within the Company's leadership structure. Hancher's warning had the clear effect of discouraging Mr. Sharma from making further complaints and signaled that the Company would not hold Littlewood accountable regardless of the evidence of discrimination.

49.     Despite this discouragement from the Head of HR, and despite the continued discriminatory treatment he was experiencing, Mr. Sharma persisted in his attempts to seek help through internal channels. By this point, the harassment and hostile work environment had begun manifesting in severe physical and psychological symptoms.

50.     On June 11 and June 14, 2025, as Littlewood's harassment continued to escalate and take an increasingly severe toll on his health, Mr. Sharma again complained to HR. During these complaints, Mr. Sharma provided HR with a doctor's note confirming that he was suffering from anxiety and panic attacks that were directly related to and caused by his treatment by Littlewood in the workplace. Mr. Sharma's physician had diagnosed him with Generalized Anxiety Disorder and prescribed medication—specifically Hydroxyzine—to treat the panic attacks and severe anxiety he was experiencing as a direct result of the discriminatory treatment and hostile work environment at Brainlabs.

51.     Even with medical documentation establishing that Littlewood's conduct was causing Mr. Sharma serious psychological harm, Brainlabs took no meaningful action. No investigation was conducted. Littlewood was not counseled, disciplined, or separated from supervising Mr. Sharma. No protective measures were implemented. The Company's complete inaction enabled Littlewood to continue his discriminatory conduct unabated and sent a clear message that complaints of discrimination would be ignored regardless of the severity or the evidence presented.

52.     Approximately two weeks later, on June 25, 2025, Littlewood placed Plaintiff on a formal Performance Improvement Plan with an August 6, 2025, deadline.

53.     The PIP was patently pretextual. It was based on mischaracterized issues, manufactured criticisms of work that had already been approved and praised by other senior

11

leaders, and selective fault-finding designed to create a false paper trail justifying Mr. Sharma's eventual termination. Each allegation in the PIP fell apart under scrutiny and demonstrated that the true purpose was retaliation, not legitimate performance management.

54.     The PIP alleged deficiencies with the Noble Panacea proposal, citing it as an example of work that was not properly positioned before being sent to the client. However, this criticism was demonstrably false. Mr. Sharma's prior supervisor, Hull, had personally reviewed the Noble Panacea proposal before it was sent to the client. Hull had expressly told Mr. Sharma that the proposal was "perfect to share," with only one minor note—that Mr. Sharma should have called out his top recommendation more clearly. Given that the work had been reviewed, approved, and deemed "perfect" by Mr. Sharma's supervisor at the time, there was no legitimate basis for Littlewood to retroactively characterize it as a performance deficiency worthy of inclusion in a formal PIP.

55.     The PIP also criticized the Capital One DataOps 360 proposal, falsely claiming that this work was not fully aligned or approved prior to the client meeting. In reality, the Capital One DataOps 360 proposal was a highly collaborative effort that went through multiple iterations and was reviewed and expressly approved by four senior leaders at Brainlabs: Jeremy Hull, Mark Syal, Joel Gomez, and Sasha Callegari. The proposal had full alignment and sign-off from senior leadership before the client meeting. Littlewood's claim that this work was not properly vetted was not only factually incorrect but also represented an attempt to retroactively recast thoroughly reviewed and approved work as a performance failure.

56.     The PIP further included criticism of the Dukes MMM methodology and the recommendation of a Geo Lift testing framework for the client. Littlewood characterized this as a flawed approach that demonstrated poor judgment. However, Mr. Sharma had developed the Geo

Lift framework after thorough consultation with other team members. The decision to use Geo Lift rather than a matched market test was made because matched market testing requires highly similar control and test regions, which were not feasible given the level of data aggregation in the Dukes dataset. Geo Lift was the strategically correct and technically sound approach for the available data. Far from being a performance deficiency, Mr. Sharma's recommendation reflected appropriate expertise and sound judgment. The inclusion of this work in the PIP was yet another example of Littlewood selectively mischaracterizing competent professional work as inadequate.

57.    The PIP also alleged that Mr. Sharma had failed to provide adequate vision and structure documents for his team. This criticism was baseless. Mr. Sharma had shared a complete team organizational structure and a comprehensive vision deck with Littlewood. At the time he provided these documents, Mr. Sharma understood that they met Littlewood's expectations, as Littlewood did not request revisions or express any concerns. If there were specific gaps or additional documents Littlewood expected to see, he never clearly communicated those expectations to Mr. Sharma. The retroactive inclusion of this issue in the PIP suggested that Littlewood was searching for any possible basis to criticize Mr. Sharma's work, regardless of its actual quality or completeness.

58.    Perhaps most tellingly, the PIP criticized Mr. Sharma's use of standard professional tools that were widely accepted in the industry and that Mr. Sharma had used transparently throughout his tenure. Specifically, Littlewood raised as a performance concern Mr. Sharma's use of ChatGPT to validate Python code for a large forecast project for the Hornblower client. Using AI tools for code validation and quality assurance is a responsible and increasingly common practice in data analytics. Mr. Sharma used the tool appropriately to ensure the accuracy of his work. Similarly, the PIP criticized Mr. Sharma's use of Grammarly, a widely-used writing

assistance tool. Mr. Sharma had always been completely transparent about using Grammarly to ensure clarity and professionalism in his written communications, particularly given his non-native English-speaking background. Littlewood's decision to frame the use of these standard tools as performance deficiencies—rather than examples of diligence and transparency—strongly suggested that his criticisms were pretextual and rooted in discriminatory animus toward Mr. Sharma's national origin.

59. During the PIP period, Mr. Sharma made repeated, good-faith efforts to seek substantive feedback from Littlewood in order to understand expectations and demonstrate improvement. However, Littlewood refused to provide meaningful guidance or support. In one particularly revealing exchange, Mr. Sharma asked Littlewood whether Littlewood could walk him through his approach to building a measurement plan, hoping to align on methodology and expectations. Littlewood responded dismissively, asking, "Is it worth investing my time?" When Mr. Sharma confirmed that yes, he believed such a conversation would be valuable, Littlewood nevertheless failed to follow through. Littlewood had no genuine interest in supporting Mr. Sharma's improvement or success. Instead, Littlewood was setting Mr. Sharma up to fail by denying him the substantive feedback and mentorship that would be necessary to address the alleged performance concerns, thereby manufacturing a basis for termination.

60. On July 14, 2025, Mr. Sharma submitted a detailed formal grievance to Sean Seamer, the North America CEO, outlining the discrimination, harassment, retaliation, and lack of support from Human Resources that he had experienced. In his grievance, Mr. Sharma provided specific examples of Littlewood's discriminatory comments, the pretextual nature of the PIP allegations, the temporal connection between his protected complaints and the adverse employment actions, and the medical harm he had suffered as a result of the hostile work

14

environment. Mr. Sharma requested an unbiased review of his performance and treatment, protection from further retaliation, and the opportunity to work in a safe, respectful, and inclusive environment.

61.     Rather than conducting a thorough and impartial investigation, Brainlabs conducted what can only be characterized as a sham investigation designed to reach a predetermined conclusion. The investigation included interviews with the parties involved, but failed to meaningfully examine the substantial evidence Mr. Sharma had presented, including the clear temporal connections between his complaints and the adverse actions, the pretextual nature of the PIP allegations, and the medical documentation establishing the harm caused by the discriminatory treatment.

62.     On September 2, 2025, Brainlabs informed Mr. Sharma in writing that his grievance was not upheld. The Company's response, authored by Sophie Newton, summarily concluded that there was "no evidence" to support Mr. Sharma's allegations of bullying, discrimination, micromanagement, or retaliation. The response dismissed each of Mr. Sharma's claims with conclusory statements, characterizing Littlewood's conduct as merely "in line with Brainlabs' expectations of a new manager getting to know the team" and asserting that the performance reviews had been conducted in accordance with company process. The Company made no effort to explain the timing of the adverse actions, the inconsistency between Mr. Sharma's prior positive reviews and the sudden negative evaluation, the approval of work that was later criticized in the PIP, or the disparate treatment compared to Littlewood's other direct reports. The investigation's conclusion was not credible and demonstrated Brainlabs' deliberate indifference to clear evidence of discrimination and retaliation.

63.    On September 5, 2025, just three days after denying his grievance, Brainlabs executed its final act of retaliation and terminated Mr. Sharma's employment. The stated reason for the termination was that Mr. Sharma had allegedly failed to demonstrate sufficient improvement during the PIP period. However, this justification was impossible to assess fairly because, as described above, Littlewood had refused to provide substantive feedback or guidance during the PIP period. Mr. Sharma had been denied the opportunity to understand expectations, receive mentorship, or demonstrate meaningful improvement. The termination decision was predetermined, and the PIP was merely a vehicle to create the appearance of legitimate performance management while masking the true retaliatory motive.

64.    On or about September 19, 2025, approximately two weeks after terminating Mr. Sharma on September 5, 2025, Brainlabs posted a job opening on LinkedIn for Mr. Sharma's replacement.

65.    As a direct result of Defendant's unlawful conduct, Plaintiff has suffered severe physical and emotional harm requiring medical treatment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Discrimination Under Section 1981

66.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

67.    42 U.S.C. § 1981 prohibits employers from discriminating against employees based on race and color.

68.    As described herein, Defendant intentionally discriminated against Plaintiff on the basis of his race and color in violation of Section 1981 by: creating, fostering, and negligently failing to prevent or remedy a hostile work environment; subjecting him to disparate treatment in

16

the terms and conditions of his employment based on his race, color, and national origin; issuing pretextual negative performance evaluations; placing him on a pretextual Performance Improvement Plan; and wrongfully terminating his employment.

69. Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights.

70. Defendant did not subject similarly situated non-Indian/South Asian employees to similar treatment. Plaintiff has named several similarly situated comparators whom Defendant treated more favorably than Plaintiff.

71. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

72. Plaintiff requests relief as hereinafter described.

**SECOND CAUSE OF ACTION**
**Retaliation Under Section 1981**

73. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

74. 42 U.S.C. § 1981 prohibits retaliation against individuals who oppose racial discrimination or assert their rights under Section 1981.

75. As described herein, Plaintiff engaged in activities protected by Section 1981 by complaining about racial and national origin-based discrimination, harassment, and hostile work environment to Human Resources on April 1, May, June 11, and June 14, 2025, and by submitting a formal grievance to senior management on July 14, 2025.

76.    After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff by subjecting him to a pretextual negative performance evaluation on May 2, 2025; placing him on a pretextual Performance Improvement Plan on June 25, 2025; denying his formal grievance on September 2, 2025; and wrongfully terminating his employment on September 5, 2025.

77.    Defendant would not have subjected Plaintiff to the negative performance evaluation, the Performance Improvement Plan, or terminated his employment, but for Plaintiff's complaints of discrimination.

78.    Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

79.    Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights.

80.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

81.    Plaintiff requests relief as hereinafter described.

### THIRD CAUSE OF ACTION
### Race, Color, and National Origin Discrimination Under the NYSHRL

82.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

83.    New York State Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, **race**, creed, **color**, **national origin**, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, ... to discriminate against such

individual in compensation or in terms, conditions or privileges of employment.

(Emphasis added).

84.     As described herein, Defendant engaged in unlawful employment practices prohibited by the NYSHRL, by discriminating against Plaintiff on the basis of his race, color, and national origin by: creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment; subjecting him to disparate treatment in the terms and conditions of his employment; and wrongfully terminating his employment.

85.     Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's legally protected rights.

86.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

87.     Plaintiff requests relief as hereinafter described.

**FOURTH CAUSE OF ACTION**
**Retaliation Under the NYSHRL**

89.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

90.     New York State Executive Law § 296(7) provides that:

[I]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

91.     As described herein, Plaintiff engaged in protected activities by complaining of discrimination, harassment, and hostile work environment to Human Resources on April 1, May,

19

June 11, and June 14, 2025, and by submitting a formal grievance to senior management on July 14, 2025.

92.     After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff by subjecting him to a pretextual negative performance evaluation on May 2, 2025; placing him on a pretextual Performance Improvement Plan on June 25, 2025; denying his formal grievance on September 2, 2025; and wrongfully terminating his employment on September 5, 2025.

93.     Defendant would not have subjected Plaintiff to the negative performance evaluation, the Performance Improvement Plan, or terminated his employment, but for Plaintiff's complaints of discrimination and harassment.

94.     Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

95.     Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's legally protected rights.

96.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

97.     Plaintiff requests relief as hereinafter described.

**FIFTH CAUSE OF ACTION**
**Race, Color, and National Origin Discrimination Under the NYCHRL**

98.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

99.     New York City Administrative Code § 8-107(1)(a) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or agent thereof, because of the actual or perceived age, **race**, creed, **color**, **national origin**, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status of any person . . . to discharge from employment such person; or . . . to discriminate against such person in the compensation or in terms, conditions or privileges of employment.

(Emphasis added).

100.    As described herein, Defendant engaged in unlawful employment practices prohibited by the NYCHRL, by discriminating against Plaintiff on the basis of his race, color, and national origin by: creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment; subjecting him to disparate treatment in the terms and conditions of his employment based on his race, color, and national origin; and wrongfully terminating his employment.

101.    The NYCHRL must be construed liberally and independently from federal and state civil rights laws to accomplish the uniquely broad and remedial purposes of New York City's human rights protections.

102.    Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's legally protected rights.

103.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

104.    Plaintiff requests relief as hereinafter described.

21

## SIXTH CAUSE OF ACTION
### Retaliation Under the NYCHRL

106.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    New York City Administrative Code § 8-107(7) provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter[.]

108.    As described herein, Plaintiff engaged in activities protected by the NYCHRL by complaining of 8. discrimination, harassment, and hostile work environment to Human Resources on April 1, May, June 11, and June 14, 2025, and by submitting a formal grievance to senior management on July 14, 2025.

109.    After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff by subjecting him to a pretextual negative performance evaluation on May 2, 2025; placing him on a pretextual Performance Improvement Plan on June 25, 2025; denying his formal grievance on September 2, 2025; and wrongfully terminating his employment on September 5, 2025.

110.    Defendant would not have subjected Plaintiff to the negative performance evaluation, the Performance Improvement Plan, or terminated his employment, but for Plaintiff's complaints of discrimination and harassment.

111.    Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

112.    Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's legally protected rights.

113.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief

114.    Plaintiff requests relief as hereinafter described.

## JURY DEMAND

115.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Section 1981, the NYSHRL, and the NYCHRL in that Defendant discriminated against Plaintiff on the basis of his race, color, and national origin and retaliated against him for complaining about such discrimination;

B. Awarding damages to Plaintiff for all lost wages, back pay, front pay, and benefits resulting from Defendant's unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff pre- and post-judgment interest;

F. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action pursuant to the applicable fee-shifting statutes; and

23

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just,

and proper.

Dated:  Bellport, New York
       April 20, 2026

Respectfully submitted,

**MESIDOR PLLC**

Marjorie Mesidor
Katlyn Palmatier
30 Station Road, Suite 5
Bellport, NY 11713
(212) 930-6010
mm@marjoriemesidor.com
kp@marjoriemesidor.com

*Attorneys for Plaintiff*

24